# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### WINCHESTER DIVISION

| | | |
|---|---|---|
| Trevor Sanders, | ) | |
|     Plaintiff, | ) | |
| v. | ) | |
| Clint Shrum, in his official capacity as Sheriff of Grundy County and in his individual capacity; T.J. Bean, in his official capacity and individual capacity; Officer Jane Doe, in her official and individual capacity; Deidre Helton, in her official and individual capacity; Adam Floyd, in his official and individual capacity; Jessie Kinsey, in her official and individual capacity; Grundy County Board of Education; Crystal Stiefel; Daniel Richardson; and Jamie Richardson; | ) | Case No.:<br><br>JURY DEMAND (12) |
|     Defendants. | ) | |

## COMPLAINT

Comes now the Plaintiff, Trevor Sanders ("Plaintiff" or "Trevor"), by and through his undersigned counsel, and respectfully submits this Complaint and states as follows:

### INTRODUCTION

1.  Trevor Sanders was an exemplary, civic-minded student with a 3.9 GPA. He was a model student. He held the second-highest ACT score of his graduating class at 32, with a perfect score on the English portion. As a four-year member of Future Business Leaders of America, Trevor has represented Grundy County at the national level each year during his high school career. Despite these accolades, Trevor was recently disciplined at school and

subsequently arrested and jailed for merely exercising his constitutional right to speak on a matter of public importance. This cause of action arises out of that discipline, arrest, and jailing.

## PARTIES

2.      At all times relevant, Plaintiff was and is a citizen and resident of Tennessee. At the time of the events described herein, he was 18 years old.

3.      Upon information and belief, at all times relevant, Defendants Daniel Richardson ("Mr. Richardson") and Jamie Richardson ("Mrs. Richardson") were and are citizens and residents of Tennessee and Grundy County.

4.      Upon information and belief, at all times relevant, Circuit Court Clerk Crystal Stiefel ("Defendant Stiefel"), sued in her individual capacity, was and is a citizen and resident of Tennessee and Grundy County.

5.      Upon information and belief, at all times relevant, Sheriff Clint Shrum ("Sheriff Shrum"), sued in his official capacity as Sheriff of Grundy County and in his individual capacity, was and is a citizen and resident of Tennessee and Grundy County.

6.      Upon information and belief, at all times relevant, Deputy T.J. Bean ("Deputy Bean"), sued in his official capacity as a Sheriff's Deputy of Grundy County and in his individual capacity, was and is a citizen and resident of Tennessee and Grundy County.

7.      Upon information and belief, at all times relevant, Officer Jane Doe, sued in her official capacity as a corrections officer employed by Grundy County and in her individual capacity, was and is a citizen and resident of Tennessee and Grundy County.

8.      Upon information and belief, at all times relevant, Principal Deidre Helton ("Principal Helton"), sued in her official capacity as Principal of Grundy County High School (the "School"), was and is a citizen and resident of Tennessee and Grundy County.

9.    Upon information and belief, at all times relevant, Vice Principal Adam Floyd ("Vice Principal Floyd"), sued in his official capacity as Vice Principal of Grundy County High School and in his individual capacity, was and is a citizen and resident of Tennessee and Grundy County.

10.    Upon information and belief, at all times relevant, Director of Schools Jessie Kinsey ("Director Kinsey"), sued in her official capacity as Director of Schools of Grundy County High School and in her individual capacity, was and is a citizen and resident of Tennessee and Grundy County.

11.    At all times relevant, Grundy County was and is a county government organized and existing under the laws of the State of Tennessee.

12.    At all times relevant, the Grundy County Board of Education (the "Board") was and is a duly established government board organized and existing under the laws of Grundy County and the State of Tennessee.

13.    At all times relevant, Director of Schools Jessie Kinsey, Principal Deidre Helton, and Vice Principal Adam Floyd had final decision-making and policy-making authority with regard to student discipline for the purposes of 42 U.S.C. § 1983.

14.    Sheriff Clint Shrum ("Sheriff Shrum"), as the Sheriff of Grundy County, has final decision-making and policy-making authority with regard to law enforcement activities, including seizure and jailing of criminal defendants, in Grundy County for the purposes of 42 U.S.C. § 1983.

15.    Grundy County is a "person" for the purposes of 42 U.S.C. § 1983.

16.    The Board is a "person" for the purposes of 42 U.S.C. § 1983.

17.    At all times relevant, the acts, omissions, customs, practices, and other conduct of Director Kinsey, Principal Helton, Vice Principal Floyd, Sheriff Shrum, Deputy Bean, and Officer Jane Doe that gave rise to this action were committed under the color of state law.

## JURISDICTION AND VENUE

18.    Plaintiff incorporates the foregoing paragraphs as if restated here, verbatim.

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as Plaintiff's claims arise, in part, under the laws of the United States, specifically the First and Fourth Amendments to the Constitution of the United States. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims herein, as they are so related to claims within the original jurisdiction of this Court that they form part of the same case or controversy.

20.    This Court possesses personal jurisdiction over the parties, who are residents of the State of Tennessee and the Eastern District.

21.    Venue is proper in this Court under 28 U.S.C. § 1391(b), as Defendants reside in this district, and all of the tortious conduct giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

### *The Board Changes Academic Honors Policy*

22.    In December 2017, at a meeting of the Board, the Board voted to adopt a policy that prohibited students graduating early from high school to be ranked in the top ten of the graduating class.

23.     Accordingly, the Board voted to amend the Grundy County High School Student Handbook regarding how students qualify for the top two academic achievement rankings, specifically the honors of "valedictorian" and "salutatorian."

24.     Upon information and belief, the proposal was promulgated and passed to prevent juniors that were graduating early from being selected for certain academic achievement honors, including being named valedictorian of the graduating class.

25.     Sometime thereafter, unbeknownst to Trevor and the rest of the graduating class, the Board reversed its position and adopted a policy that allowed students graduating early to be eligible for the top two academic rankings.

26.     Around 3:30 p.m. on Monday, April 2, 2018, school officials announced over the public address system that a junior who was graduating early was the valedictorian of the Grundy County High School Class of 2018.

27.     At the same time, school officials also announced that seniors were to report to the cafeteria.

28.     The student announced as valedictorian was the daughter of Mr. Richardson and Mrs. Richardson, a teacher at the School.

29.     At that time, many of the seniors, including Trevor, were surprised that the honor of valedictorian was given to a junior who had not been in any of their classes and had not attended six semesters of high school prior to her senior year.

### *School Implements Ban on Speech about Valedictorian Policy*

30.     When Trevor and other students were filing into the cafeteria, and before the meeting had begun, Plaintiff walked over to the table where the senior with the highest GPA was seated, pointed at her, and said, "Hey, there's the real valedictorian." This statement was

overheard by Principal Helton, who yelled, "That's enough!" and told Plaintiff to "sit down." Trevor complied.

31. Mr. and Mrs. Richardson's daughter, the named valedictorian, was not in the room.

32. After the meeting, Trevor expressed to some of his peers in the hallway his disagreement with the decision to give the valedictorian honor to a junior. He did so in a normal tone of voice.

33. Trevor went home that day and returned to school on Wednesday, April 4.[1]

34. On the morning of Wednesday, April 4, Trevor was called to the principal's office and was met by Principal Helton and Vice Principal Floyd.

35. At this meeting, Principle Helton and Vice Principal Floyd accused Trevor of harassment and told him to stop speaking about the valedictorian issue.

36. Additionally, Principal Helton and Vice Principal Floyd threatened to withhold Trevor's diploma and escort him off of the property if he engaged in a protest at graduation.

37. Trevor expressed his belief that the First Amendment protected his right to speak on the valedictorian matter.

38. Trevor then returned to class and later recounted the meeting to some of his classmates during class and lunch period.

39. Trevor did not disrupt any classroom activity with his speech.

### Plaintiff Is Punished For His Protected Speech

40. At the end of fifth-period class, as Trevor was walking back from the bathroom, Principal Helton and Vice Principal Floyd called to Trevor from down the hall and told him to

---

[1] Tuesday, April 3, was the ACT exam for juniors, so seniors were not required to attend school.

report to the office a second time.

41.     On the way to the office, Trevor called his grandmother and discovered that school officials had told her that he had been harassing another student.

42.     When Trevor arrived at the principal's office, Director Kinsey was seated just outside of the meeting room.

43.     Upon information and belief, Director Kinsey previously had consulted Principal Helton and Vice Principal Floyd regarding Trevor's statements.

44.     Upon information and belief, at the relevant time, the Board had never evaluated Director Kinsey since they hired her on December 8, 2015, in violation of state law, the Board's written policy, and Director Kinsey's contract.

45.     School Resource Officer Philip Hobbs ("Officer Hobbs"), a member of the Grundy County Sheriff's Department, was in the meeting room. Trevor notified those present that he was recording the meeting.

46.     In this meeting, Trevor was told that he already had been warned not to speak about the valedictorian decision and was accused of committing harassment by continuing to speak on the matter.

47.     When Trevor inquired into how his statement, which was never made to Mr. and Mrs. Richardson's daughter and was not disparaging to her in any way, amounted to harassment, the school officials could not muster a coherent response.

48.     Nonetheless, as punishment for his speech about the Board's valedictorian policy, Trevor was given three days of in-school suspension ("ISS") for harassment and insubordination.

49.     The Grundy County High School Handbook, adopted by the Board, states that "[c]ausing emotional distress to a student" constitutes "harassment."

50.     Upon information and belief, Director Kinsey was aware that Trevor would be disciplined for his speech, and she approved of and ratified the punishment.

51.     In the same meeting, Trevor requested to file a formal civil rights complaint against the school.

52.     Trevor was then escorted to the ISS room by Officer Hobbs.

53.     Trevor was later sent to a conference room with the Director of Secondary Education, Samantha Stevens, to file his civil rights complaint. Ms. Stevens instructed him to email his complaint to her. Trevor did so.

54.     School officials did not respond to the civil rights complaint. Rather, Trevor was sent a letter stating that his complaint had been forwarded to the Grundy County Board of Education's attorney, and that he should have a lawyer contact the Board's attorney if he had further questions. No other response has been provided.

### Plaintiff Is Arrested And Jailed For His Protected Speech

55.     Later that evening, Trevor posted the video of his meeting in the principal's office on his personal Facebook page, and he explained his disagreement with (i) the School administration's decision to award a junior the honor of valedictorian, and (ii) the administration's decision to punish him for his speech about the issue.

56.     The Facebook post reads as follows:

This is the problem at Grundy County High School. Speaking out against a decision is "harassment", and exercising my 1st Amendment right to my opinion is "insubordination." The administration at Grundy County High School no longer seems to care about student experience. The only things that matter to Deidre Helton and Adam Floyd are test scores and sports headlines. Meanwhile, if you're just a regular student, you can expect to be met with hostility if you express any dissent against their rule. Civil Servants, funded by your tax dollars, act as autocrats with almost zero checks to their power.

For context: A member of the Class of 2019 has earned the ability to graduate

early. Despite that she was never competing with the Seniors, she was given Valedictorian for the Class of 2018. Many Seniors, myself included, did not think this was fair. I've vocalized my opinion, stating that "Seniors were robbed!" and making jokes about "#NotMyValedictorian." Other than these humor-derived remarks, I've also had logical discussions with other students on both sides of the situation. However, because a handful of students were "offended" by my words, I was sent to the office and written up for harassment. I received 3 days of ISS for showing dissent with the administration. No derogatory, insulting, or objectively offensive remarks were made toward the student who was named Valedictorian. My problem is, and has always been, with the decision to consider her for the honor. Her early graduation is enough of a reward; Valedictorian should go to the student who has worked the hardest for four years, rather than a student who took the shorter way with credit recovery.

I don't think that the girl should have Valedictorian taken from her. I feel that she never should have been considered for it, but what is done is done. Now, the sensible option would be to give this student and the highest-average Senior Co-Valedictorianships. #3 would be given Salutatorian. This not only eliminates the tension between the Junior girl and the Senior class, but also gives another student the honor to speak on stage.

Note: I informed the administration that I was recording this video. If you have any questions or would like additional context, please feel free to ask.

I'd also like to thank "Flop the Super Cop" for escorting me to and from ISS. I don't know how I could have ever found it without your help, considering I've been there for four years and all.

57.     Upon information and belief, this post angered school officials and personnel, including Mrs. Richardson, Director Kinsey, Principal Helton, and/or Vice Principal Floyd.

58.     Upon information and belief, Sheriff Shrum was contacted by school officials and/or personnel regarding their desire to have Trevor arrested for his speech at school and on social media about the valedictorian issue.

59.     On April 4, 2018, after business hours, Defendant Stiefel went to the county courthouse for the sole purpose of issuing a warrant for Trevor's arrest. There, she met officers from the Sheriff's Department and Mr. and Mrs. Richardson.

60.     Mr. Richardson swore out and signed an affidavit to have Trevor arrested.

61.     The warrant contained false statements.

62.     The warrant was facially deficient in that it did not allege any elements of a crime and did not establish probable cause that a crime had been committed.

63.     The warrant amounted to a single conclusory allegation.

64.     The warrant stated in its entirety, "Trevor Sanders has been harassing my daughter at school and putting post [sic] on facebook [sic] regarding the situation at school. My daughter has gotten valedictorian and I want this to stop. I have a copy of the video for review."

65.     Neither the warrant nor the affidavit alleged any conduct by Trevor, verbal or otherwise. The affidavit simply stated a legal conclusion that Trevor was "harassing" Mr. Richardson's daughter.

66.     Trevor never spoke to Mr. and Mrs. Richardson's daughter or said anything disparaging about her.

67.     Upon information and belief, the affidavit referenced the video of Trevor in the principal's office that Trevor posted on Facebook.

68.     Sheriff Shrum is listed as the "Approving Officer" of Trevor's facially deficient and unlawful arrest warrant.

69.     Sheriff Shrum ratified Trevor's unlawful arrest.

70.     Upon information and belief, school officials provided the Grundy County Sheriff's Department with Trevor's mother's address to effectuate the arrest.

71.     At 10:51 p.m., Trevor received a call from his mother that the police were at her house asking to speak with Trevor. At that time, Trevor was staying at his grandmother's address.

72.     Shortly thereafter, Monteagle police officers arrived at Trevor's grandmother's house and told Trevor to wait for a Grundy County Sheriff's Deputy.

73.     Grundy County Sheriff's Deputy T.J. Bean ("Deputy Bean") then arrived and confirmed Trevor's identity, informed Trevor that he had a warrant for his arrest for harrassment, and handcuffed him.

74.     At least six patrol vehicles arrived at Trevor's grandmother's house to make the arrest. Trevor was then placed in the back of one of the Grundy County patrol vehicles.

75.     Under the Grundy County Sheriff Department's policy, "[d]eputies shall activate [body-worn cameras] to record all contacts with citizens in performance of official duties."

76.     Deputy T.J. Bean signed the policy on March 20, 2015.

77.     All Grundy County Sheriff's Department personnel who were present at the time of Trevor's arrest either failed to activate their body-worn cameras or were not wearing body-worn cameras.

78.     Once at the jail, Trevor was told by Deputy Bean that his arrest was due to his social media posts about the school's valedictorian policy.

79.     Referencing the post, Deputy Bean told Plaintiff that he (Deputy Bean) coined "Flop the Super Cop" in reference to Officer Hobbs.

80.     Trevor was booked on a criminal charge of "harassment non verbal [sic] threat" of Mr. and Mrs. Richardson's daughter under Tenn. Code Ann. § 39-17-308 and searched, finger-printed, and photographed.

81.     Trevor was taken to the jail showers and was forced to strip naked, squat, and cough in front of an officer.

82. Trevor was then told to wash his hair with louse shampoo and to put on an inmate uniform. Plaintiff was then taken to a cell.

83. Trevor was forced to spend the night in jail and was not allowed to post bond until the following morning. The next day, bond was set at $1,000.

84. The next morning, Trevor was questioned by Officer Jane Doe, who told him that he would be back in custody if he spoke about the valedictorian issue again.

85. Once bond was set, Officer Jane Doe again told Trevor he would be arrested and jailed again if he did not stop speaking about the valedictorian issue.

86. After Plaintiff met with a bondsman, Officer Jane Doe again threatened Trevor to stop speaking about the valediction issue by telling him to "remember" and putting her finger to her mouth, gesturing to the Trevor that he should keep quiet.

87. Officer Jane Doe told Trevor's grandmother that Trevor would be put back in jail until his court date if he said anything further regarding the valedictorian issue.

88. Because of the trauma of the arrest and subsequent events, Trevor experienced prolonged emotional pain and suffering.

89. The District Attorney's Office reviewed the case, realized its invalidity, and dismissed the charge against Trevor prior to his first court date.

### *Defendants' Further Retaliation Against Plaintiff For His Protected Speech*

90. After reports of the arrest began to surface, many people in the community became understandably outraged.

91. School officials, however, continued to enforce the school's policy that students were not permitted to speak about the valedictorian issue.

92.     School officials warned students that they would be punished with suspension if they violated the policy by speaking about the valedictorian issue.

93.     On April 9, in the midst of public outrage at the actions of the Sheriff's Department for detaining Trevor, Sheriff Shrum posted on Facebook about Trevor: "Matthew 18 gives a wonderful illustration of a man who wanted everyone to be accountable to him but he himself did not want to be held accountable    . . . #youshallknowthetruth."

94.     On April 11, Sheriff Shrum posted on Facebook about Trevor: "Ephesians 4:14 (KJV) That we henceforth be no more children, tossed to and fro, and carried about with every wind of doctrine, by the sleight of men, and cunning craftiness, whereby they lie in wait to deceive[.]"[2]

95.     Sheriff Shrum's posts were intended to smear Trevor's reputation by implying that Trevor lied in his Facebook post.

96.     In a now-deleted Facebook post on the official Grundy County Sheriff's Office page, Sheriff Shrum further endorsed the actions of Mr. and Mrs. Richardson and the Department's policy of arresting Trevor in violation of his constitutional rights:

> Considering recent events surrounding the April 4th arrest of Trevor Sanders, I feel it is necessary to address this issue one final time. There is this preposterous notion that my office acted outside the guides of the Constitution and state law. Tennessee Code Annotated 8-8-201 outlines the duties of the Office of the Sheriff. The first line of that statute states, "It is the sheriff's duty to: (1) Execute and return, according to law, the process and orders of the courts of record of this state, and of officers of competent authority, with due diligence, when delivered to the sheriff for that purpose. A warrant issued by the Circuit Court Clerk's Office is an order of the court. This is exactly what happened in the arrest of Plaintiff Sanders. The father of the victim acted to protect his child as any good father would and should do. This child had done nothing but excel in her

---

[2]     On July 5, 2018, Sheriff Shrum admitted the post was about Trevor when he provided it in response to counsel's public record request, which requested, in pertinent part, "any and all communications in any form . . . regarding Trevor Sanders."

academics. She had absolutely no input surrounding the decisions that started this firestorm. . . .

97.     In addition, Defendant Stiefel, in her individual capacity as a candidate for elective office who had faced intense scrutiny over Trevor's arrest, told at least one media outlet (Rosana Hughes of the Times Free Press) that Trevor's arrest was "not based off a Facebook post," and that "[t]here is more evidence that was brought forth" of Plaintiff's harassment of Mr. and Mrs. Richardson's daughter.

98.     Defendant Stiefel's statements to Ms. Hughes were false. There was no evidence of harassment.

99.     Defendant Stiefel knew the statements were false.

100.     Defendant Stiefel's false statements were intended to smear and disparage Trevor.

101.     Defendant Stiefel's false statements did, in fact, damage Trevor's reputation.

102.     After the District Attorney's Office immediately dismissed the charge against Trevor, school officials and Sheriff Shrum further colluded to silence Trevor.

103.     Upon information and belief, school officials called Sheriff Shrum and allowed Sheriff Shrum to come to the school in an attempt to bring more false charges against Trevor.

104.     Specifically, Sheriff Shrum asked other students to sign false affidavits alleging that Trevor had threatened them.

105.     All of the students who Sheriff Shrum asked to sign such an affidavit refused to sign.

106.     On April 16, in another attempt to silence Trevor, the school again allowed Sheriff Shrum free rein of school property to interrogate Trevor. The school made no attempt to contact a parent, a guardian, or an attorney prior to ordering Trevor to speak to Sheriff Shrum.

107.   School officials sent Trevor to a small room where Sheriff Shrum and Officer Hobbs were waiting for him. Sheriff Shrum stated that he was not there to discuss Trevor's then-pending criminal case but hoped to the resolve the "craziness on behalf of the school."

108.   Multiple times, Trevor refused to answer questions on advice of counsel, but Sheriff Shrum continued to question Trevor in complete disregard of his constitutional rights. Trevor recorded the interaction.

109.   By the time Trevor's case was dismissed, in an attempt to repair the Board's image, the Board made the unprecedented move of allowing a statement by Mr. and Mrs. Richardson to be read at the Board meeting, in which Mr. and Mrs. Richardson recommended, if the top academic honor were not determined by the highest average, that the Board consider giving the valedictorian honor to all students who have at least a 4.0 GPA.

110.   Board Member Chris Snyder admitted that the Board had "dropped the ball." And then, at the recommendation of Mr. and Mrs. Richardson, the Board adopted the Richardsons' idea, which resulted in the Board's naming a total of eleven (11) valedictorians.

111.   Neither the Board, school officials, Sheriff's Department, nor Sheriff Shrum ever apologized to Trevor or his family or told him that he was permitted to speak about the valedictorian issue without further retaliation.

112.   Additionally, no school officials, including Mrs. Richardson, have been reprimanded for their unconstitutional acts against Trevor.

113.   No one associated with or employed by the Grundy County Sheriff's Department have been reprimanded for their unconstitutional acts against Trevor.

114.   The school also has refused to provide an answer to Trevor's civil rights complaint that he filed at the time of his suspension.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### Pursuant to 42 U.S.C. § 1983
**(Deidre Helton, in her official and individual capacity; Adam Floyd, in his official and individual capacity; Jessie Kinsey, in her official and individual capacity; Grundy County Board of Education)**

115.   Plaintiff incorporates the foregoing paragraphs as if restated here, verbatim.

116.   At all times relevant, the conduct of Director Kinsey, Principal Helton, Vice Principal Floyd, Defendant Stiefel, and Sheriff Shrum was subject to 42 U.S.C. §§ 1983 and 1988.

117.   Plaintiff has a clearly established constitutional right to speak publicly about school policy.

118.   Based on clearly established United States Supreme Court and Sixth Circuit case law, Director Kinsey, Principal Helton, and Vice Principal Floyd knew or should have known of Plaintiff's constitutional right to speak freely about his disagreement with the Board's policy.

119.   By their action and inaction, Director Kinsey, Principal Helton, and Vice Principal Floyd violated Plaintiff's clearly established constitutional right to free speech by suppressing and punishing his speech about a matter of public concern.

120.   At all times relevant, Director Kinsey, Principal Helton, and Vice Principal Floyd had final policy-making and decision-making authority with regard to student discipline for the purposes of 42 U.S.C. § 1983.

121.   Under Tenn. Code Ann. § 49-2-303, it is "the duty of the principal" to "[a]dminister and implement the school behavior and discipline code . . ."

122. Under Tenn. Code Ann. § 49-2-301, it is the duty of the director of schools to "[a]ct for the board in seeing that the laws relating to the schools and rules of the state and local board of education are faithfully executed . . ."

123. The Board's Grundy County High School Student Handbook even grants the principal and assistant principal "the right and authority to declare the rules outlined [in the Discipline Plan] null and void . . ." if a "severely disruptive incident occur[s] that mandates immediate action."

124. The Board is liable under 42 U.S.C. § 1983 because Director Kinsey, Principal Helton, and Vice Principal Floyd, in their capacity as final decision-makers and policy-makers of student discipline, adopted and enforced a policy that suppressed and punished Plaintiff's on-campus and off-campus protected speech.

125. The Board is liable under 42 U.S.C. § 1983 because Director Kinsey, Principal Helton, and Vice Principal Floyd, in their capacity as final decision-makers and policy-makers of student discipline, ratified the unlawful suppression of Plaintiff's on-campus and off-campus protected speech.

126. Director Kinsey, Principal Helton, and Vice Principal Floyd's actions and inactions as final decision-makers and policy-makers of student discipline were the proximate cause of the suppression of Plaintiff's speech and punishment of the Plaintiff for his protected speech in violation of 42 U.S.C. § 1983.

127. In the alternative, the Board is also liable under 42 U.S.C. § 1983 because its official "harassment" policy that Plaintiff allegedly violated is facially unconstitutional and unconstitutional as applied to Plaintiff.

128.    The Board's definition of "harassment" means that a student can be punished for harassment merely based on another student's emotional response to another student's speech. The definition is so broad that, if one student ended a romantic relationship with another, and it caused the student emotional distress, such a personal decision would constitute "harassment."

129.    The Board's harassment policy is facially unconstitutional.

130.    The Board's harassment policy is also unconstitutional as applied in this case to Plaintiff as it resulted in the violation of Plaintiff's First Amendment rights.

131.    The Board's failure to supervise Director Kinsey amounted to deliberate indifference.

132.    The Board's written policy and deliberately indifferent supervision and training of Director Kinsey were a proximate cause of the violation of Plaintiff's First Amendment right to free speech.

133.    Plaintiff's speech did not disrupt the operations of the school, activities of any classroom, or coursework of students in any way.

134.    Plaintiff was not written up for "disrupting instruction," which would have resulted in lesser punishment under the Grundy County High School Student Handbook.

135.    Thus, Director Kinsey, Principal Helton, and Vice Principal Floyd did not have any legitimate, countervailing interest in suppressing Plaintiff's speech.

136.    By their actions and inactions, Director Kinsey, Principal Helton, and Vice Principal Floyd established, ratified, and enforced a school board policy that was the proximate cause of the suppression of Plaintiff's speech and punishment of the Plaintiff for his protected speech in violation of 42 U.S.C. § 1983.

137.     Plaintiff's speech was restricted. He was disciplined at school, arrested, and jailed for expressing protected speech. And he was then threatened numerous times that he would remain jailed if he continued engaging in protected speech. The intentional suppression and punishment for Plaintiff's protected speech violated Plaintiff's First Amendment rights under the U.S. Constitution.

138.     Plaintiff has no remedy for First Amendment violations under Tennessee State law.

139.     As a direct result of Defendants' actions, Plaintiff has sustained damages.

140.     Plaintiff is therefore entitled to judgment against Defendants for damages, as well as reasonable attorney's fees and court costs.

## COUNT II: VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### Pursuant to 42 U.S.C. § 1983
**(Sheriff Clint Shrum, in his official and individual capacity; Deputy T.J. Bean, in his official and individual capacity; Deputy Jane Doe, in her official and individual capacity)**

141.     Plaintiff incorporates the foregoing paragraphs as if restated here, verbatim.

142.     Sheriff Shrum adopted, ratified, and enforced a policy that suppressed and punished Plaintiff's protected speech.

143.     Sheriff Clint Shrum ("Sheriff Shrum") has final policy-making authority with regard to executing and returning warrants for the purposes of 42 U.S.C. § 1983.

144.     Under Tenn. Code Ann. § 8-8-201(a)(1), it is the sheriff's duty to "[e]xecute and return, according to law, the process and orders of the courts of record . . ."

145.     In addition, Sherriff Shrum has final policy-making authority with regard to custody of prisoners in the county jail for the purposes of 42 U.S.C. § 1983.

146. Under Tenn. Code Ann. § 8-8-201(a)(3), it is the sheriff's duty to "[t]ake charge and custody of the jail of the sheriff's county, and of the prisoners therein; receive those lawfully committed, and keep them personally, or by deputies or jailer . . ."

147. Sheriff Shrum, as final policy-maker, adopted and enforced a policy that Plaintiff's speech relating to the "valedictorian issue" was subject to arrest without probable cause.

148. Sheriff Shrum, as final policy-maker and with final decision-making authority, ratified the unlawful suppression of Plaintiff's speech and his unlawful arrest by expressly approving of his facially deficient arrest warrant.

149. Sheriff's Shrum's policy and ratification of Plaintiff's unlawful arrest and suppression of speech were the proximate cause of his arrest and suppression of speech in violation of his First Amendment right.

150. Deputy Bean, Officer Jane Doe, and others in the Grundy County Sheriff's Department enforced Sheriff Shrum's unlawful policy.

151. Plaintiff has a clearly established constitutional right to speak publicly about school policy.

152. Based on the clearly established United States Supreme Court and Sixth Circuit case law, Sheriff Shrum, Deputy Bean, and Officer Jane Doe knew or should have known of Plaintiff's constitutional right to speak freely about his disagreement with the Board's policy.

153. By their action and inaction, Sheriff Shrum, Deputy Bean, and Officer Jane Doe violated Plaintiff's clearly established constitutional right to free speech by suppressing and punishing his protected speech by unlawfully arresting and jailing Plaintiff and by threatening to jail him again if the speech continued.

154.   Plaintiff's speech was restricted. He was disciplined at school, arrested, and jailed for expressing protected speech. And he was then threatened numerous times that he would remain jailed if he continued engaging in protected speech. The intentional suppression and punishment for Plaintiff's protected speech violated Plaintiff's First Amendment rights under the U.S. Constitution.

155.   Plaintiff has no remedy for First Amendment violations under Tennessee State law.

156.   As a direct result of Defendants' actions, Plaintiff has sustained damages.

157.   Plaintiff is therefore entitled to judgment against Defendants for damages, as well as reasonable attorney's fees and court costs.

### COUNT III: VIOLATION OF THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
**Pursuant to 42 U.S.C. § 1983 (Sheriff Clint Shrum, in his official and individual capacity; Deputy T.J. Bean, in his official and individual capacity; Deputy Jane Doe, in her official and individual capacity)**

158.   Plaintiff incorporates the foregoing paragraphs as if restated here, verbatim.

159.   Sheriff Shrum approved Plaintiff's unlawful arrest.

160.   Sheriff Shrum was the "approving officer" of the arrest warrant for Plaintiff.

161.   Sheriff Shrum, in his capacity as policy-maker and final decision-maker, directed his subordinates to arrest Plaintiff without cause.

162.   Sheriff Shrum's ratification of Plaintiff's unlawful arrest was the proximate cause of his arrest in violation of his Fourth Amendment rights.

163.   Deputy Bean, Officer Jane Doe, and others enforced Sheriff Shrum's unlawful policy of arresting Mr. Sanders without cause and in the absence of a facially valid arrest warrant.

164. Plaintiff has a clearly established right under the Fourth Amendment of the United States Constitution to not be arrested and jailed without probable cause.

165. Plaintiff's arrest and detention were unreasonable.

166. Because the affidavit supporting the warrant failed to allege any conduct by Plaintiff, verbal or otherwise, the warrant for Plaintiff's arrest was so lacking in indicia of probable cause that Sheriff Shrum, Deputy Bean, and Officer Jane Doe could not have a reasonable belief that probable cause existed.

167. No reasonable officer could have believed that the warrant for Plaintiff's arrest established the elements of a crime.

168. Sheriff Shrum, Deputy Bean, and Officer Jane Doe violated Plaintiff's clearly established constitutional right by unreasonably arresting and jailing him in violation of his Fourth Amendment rights under the U.S. Constitution by executing a facially deficient arrest warrant.

169. Sheriff Shrum, Deputy Bean, and Officer Jane Doe violated Plaintiff's clearly established constitutional right by unreasonably arresting and seizing him in violation of his Fourth Amendment rights under the U.S. Constitution because they lacked probable cause to believe Plaintiff committed a crime.

170. Plaintiff has no remedy for Fourth Amendment violations under Tennessee State law.

171. As a direct result of Defendants' actions, Plaintiff has sustained damages.

172. Plaintiff is therefore entitled to judgment against Defendants for damages, as well as reasonable attorney's fees and court costs.

## COUNT IV: DEFAMATION
### Pursuant to Tennessee Common Law
### (Crystal Stiefel)

173.     Plaintiff incorporates the foregoing paragraphs as if restated here, verbatim.

174.     Defendant Stiefel made false statements to others, including at least one member of the media, about Plaintiff.

175.     Defendant Stiefel stated to Times Free Press reporter Rosana Hughes that (i) Trevor's arrest was "not based off a Facebook post," implying that Trevor had committed a crime and (ii) "[t]here is more evidence that was brought forth [of harassment by Trevor]."

176.     These two statements were false.

177.     Defendant Stiefel knew her statements about Plaintiff were false.

178.     Defendant Stiefel knew her statements about Plaintiff were defamatory.

179.     These statements were made outside of the scope of Defendant Stiefel's official capacity as Clerk and were made in her individual capacity as a candidate for elective office.

180.     Defendant Stiefel made the statements with reckless disregard for the truth, or made the statements with negligence in failing to ascertain their truth.

181.     Defendant Stiefel's false statements were malicious.

182.     As a direct result of Defendants' actions, Plaintiff has sustained damages.

183.     Plaintiff is not a public figure.

184.     Plaintiff is therefore entitled to judgment against Defendants for actual and punitive damages, as well as reasonable attorney's fees and court costs.

### COUNT V: MALICIOUS PROSECUTION
### Pursuant to Tennessee Common Law
### (Daniel Richardson and Jamie Richardson)

185.     Plaintiff incorporates the foregoing paragraphs as if restated here, verbatim.

186.     Mr. and Mrs. Richardson intentionally instituted a judicial proceeding against Plaintiff without probable cause.

187.     Mr. Richardson made false statements to law enforcement about Plaintiff in order to institute a judicial proceeding against him. Specifically, Mr. Richardson told law enforcement that Plaintiff had harassed his daughter.

188.     Upon information and belief, Mrs. Richardson also made false statements to law enforcement about Plaintiff in order to institute a judicial proceeding against him. Specifically, Mrs. Richardson told law enforcement that Plaintiff had harassed her daughter.

189.     These statements made by Mr. and Mrs. Richardson to law enforcement were not true. Plaintiff never said anything to their daughter, and he never said anything even disparaging about her.

190.     Mr. and Mrs. Richardson knew the statements to law enforcement about Plaintiff's alleged harassment were false.

191.     Mr. Richardson signed a warrant affidavit that repeated the false allegation of harassment, knowing it was false.

192.     Said warrant was sworn out with malice.

193.     The District Attorney's Office dismissed the case immediately upon its review of the facts, because there was no factual allegation that a crime had been committed.

194.     As a direct result of Defendants' actions, Plaintiff has sustained damages.

195.     Plaintiff is therefore informed and believes he is entitled to judgment against Defendants for actual and punitive damages, as well as reasonable attorney's fees and court costs.

## PRAYER FOR RELIEF

WHEREFORE, as to each count, Plaintiff demands a trial of this cause by a jury of twelve (12) and pray for a determination of the following:

(i)     that the Defendant be cited to appear and answer;

(ii)    that judgment be entered against Defendants for compensatory damages in an amount to be determined at trial, not less than $1,000,000;

(iii)   that judgment be entered against the Defendants for punitive damages in an amount to be determined at trial;

(iv)    that Plaintiff be awarded reasonable attorney's fees;

(v)     that Plaintiff be awarded Court costs, including discretionary costs; and

(vi)    that Plaintiff be awarded such other and further relief as this Court deems necessary to effectuate justice between the parties.

**DATED** this the 17th day of September, 2018.

Respectfully submitted,

J. Alex Little (029858)
Zachary C. Lawson (036092)
Bone McAllester Norton PLLC
511 Union Street, Suite 1600
Nashville, Tennessee 37219
Telephone: (615) 238-6300
Facsimile: (615) 238-6301
alex.little@bonelaw.com
zlawson@bonelaw.com

*Attorneys for Plaintiff Trevor Sanders*